IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CLYDE JOHNSON, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-0205-G-BK |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to the district court's order of reference dated June 28, 2010, this case has been referred to the undersigned for Findings, Conclusions, and Recommendation. For the reasons set forth herein, it is recommended that the case be reversed and remanded for further proceedings.

### I. BACKGROUND[1]

**A.    Procedural History**

Clyde Johnson (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for Supplemental Security Income (SSI) benefits under the Social Security Act. On December 6, 2005, he protectively filed for SSI, claiming that he was disabled due to sickle cell anemia, hip arthroplasty, and major depression. (Tr. at 16, 84-89, 94). His application was denied, and Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ). (Tr. 16). He personally appeared and testified at a hearing held in April 2008. (Tr. at 1002-1061). In August 2008, the ALJ issued her decision finding

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

Plaintiff not disabled. (Tr. at 24). In December 2009, the Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. (Tr. at 3). Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

B.  **Factual History**

   1.  **Age, Education, and Work Experience**

Plaintiff was 40 years old at the time of the hearing before the ALJ. (Tr. at 22.) He has a 10th grade education and no past relevant work history. (Tr. 22, 100, 123).

   2.  **Medical Evidence**

Plaintiff has suffered from sickle cell disease since childhood.[2] (Tr. at 293). Additionally, he was diagnosed with major depression with psychotic features in October 2005, and his GAF score was noted as 40.[3] (Tr. at 327-28). During the relevant timeframe, Plaintiff sought consistent psychiatric treatment from ABC Behavioral Health (ABC). (Tr. at 377-97, 409-14). He indicated in January 2006 that he was overwhelmed, depressed, and anxious, and his diagnosis was listed as major depressive disorder with psychotic features. (Tr. 340-41). In February 2006, Plaintiff reported that he was trying to find part-time work, was sleeping well, his

---

[2]While the record is replete with documentation of Plaintiff's health difficulties prior to December 2005, all of which the Court has considered, the Court generally will only discuss in this recommendation the medical evidence dating from December 2005 when Plaintiff filed his application for benefits. 20 C.F.R. § 416.335 (noting that the earliest that SSI benefits can be paid is the month following the month the application was filed, and the claimant cannot be paid for any prior months even if the claimant met the requirements for SSI benefits earlier).

[3]GAF stands for Global Assessment of Functioning, and is a scale used to determine a patient's psychological functioning on a 1 to 100 scale, with 100 being superior functioning. *Diagnostic and Statistical Manual of Mental Disorders IV-TR* (4th ed.).

sickle cell disease was less painful, and he was more alert now that he was using his pain medications properly. (Tr. 395). At that time, he denied hallucinations, but did report hearing voices. (Tr. at 395). In March 2006, Plaintiff's speech was slurred and slow, and he was dysthymic. (Tr. at 379). Plaintiff's pharmacological manager at ABC noted that Plaintiff was groomed, with normal speech and behavior, displayed logical thought processes, and had no delusions or hallucinations. (Tr. at 395). In May 2006, Plaintiff denied any recent hallucinations. (Tr. at 390). In August 2006, he indicated that he had gotten a job, was trying to cope with his sickle cell pain, had no hallucinations, but was suffering from some side effects of his medications such as diarrhea and sweating. (Tr. at 387). Psychiatrist Dr. David Hershey with ABC began treating Plaintiff no later than November 2006. (Tr. at 385-86). In March 2007, Plaintiff was again diagnosed with major depressive disorder with psychotic features. (Tr. at 377).

In June 2007, Dr. Hershey administered a mental impairment questionnaire for major depressive and bipolar disorder and noted that he saw Plaintiff once a month. (Tr. 370-71). Dr. Hershey diagnosed Plaintiff with major depressive disorder and noted that his highest GAF of the past year was 40, and his prognosis was guarded. (Tr. at 371). Plaintiff was on various medications including Celexa, Zyreda, Benadryl, and Trazadone, and Plaintiff reported drowsiness as a side effect of his medications. (Tr. at 371). Dr. Hershey believed that Plaintiff met six of the nine criteria for major depressive disorder, including (1) loss of interest in almost all activities, (2) appetite disturbance with change in weight, (3) sleep disturbance, (4) decreased energy, (5) feelings of guilt or worthlessness, and (6) difficulty concentrating or thinking, although he did not have hallucinations. (Tr. at 372). Dr. Hershey further opined that Plaintiff

had marked difficulties in maintaining social functioning and extreme difficulty in maintaining concentration, persistence, or pace. (Tr. at 373). Plaintiff was severely limited in (1) remembering work procedures, (2) understanding and remembering very simple instructions, (3) maintaining regular attendance and being punctual, (4) sustaining an ordinary routine without strict supervision, (5) working near others without being unduly distracted, (6) making simple work-related decisions, (7) completing a normal workday and week without interruptions from his psychological symptoms, (8) responding appropriately to changes at work, and (9) being aware of, and able to take precautions against, normal hazards. (Tr. at 374-75). Dr. Hershey opined that Plaintiff was unable to deal with normal work stress in a competitive work environment, and his impairments would cause him to be absent from work once or twice a week. (Tr. at 374-75).

Plaintiff continued his treatment with Dr. Hershey, visiting numerous times from July 2007 until the end of the year. (Tr. 896-908). In late 2007, a service coordinator who worked with Dr. Hershey filled out a case management plan for Plaintiff, noting that Plaintiff's GAF score currently and over the past year was 40, and he had problems in almost all areas on Axis IV, including those related to social environment, education, occupation, housing, economic, access to health care, and interaction with the legal system/crime. (Tr. at 908). In October 2007, Dr. Hershey completed a physician statement opining that Plaintiff was not able to work from October 2007 to October 2008 due to his mental condition, needed continued psychotherapy, and additionally had physical restrictions on his ability to work based on his sickle cell anemia. (Tr. at 949). Plaintiff continued his psychiatric treatment with Dr. Hershey throughout 2008, during which his diagnosis was reconfirmed. (Tr. 890, 892, 894, 959-62). However, in March 2008,

4

Plaintiff reported that he was doing well and not experiencing anxiety. (Tr. at 890-91). During the relevant timeframe, Plaintiff first sought medical treatment for his sickle cell disease in December 2007, complaining of severe pain in his hip. (Tr. 128-29).

### 3. Hearing Testimony

The ALJ held a hearing in April 2008. (Tr. at 1002). She first noted that Plaintiff had been hospitalized for his sickle cell disease in February 2008, and Plaintiff's attorney had a difficult time getting the records from those health care providers, but did provide some documentation as to that hospital stay during the hearing. (Tr. at 1005-09). Plaintiff then testified that he had been in prison on drug charges for approximately ten years and was released around 2003. He could read, write, and do simple math. (Tr. at 1016). He stated that since December 2005, he occasionally had done a couple of hours of janitorial work at ABC for a period of three weeks, but had to stop working because they said he was resting too much. (Tr. at 1017-18). Plaintiff tried to get a part-time job at Goodwill, but they would not hire him once they learned he was on medication. (Tr. at 1025). He tried to work a variety of odd jobs when he got out of prison, but his efforts were unsuccessful because he would "mess up on something" or go to sleep or sit down. (Tr. at 1035-36). Plaintiff said that he could work at a job if he was able to sit and stand whenever he needed to, but he had to brace himself with one arm to take stress off of his hip, and he had been using a cane for the past three years as his hip pain became worse. (Tr. at 1026-27, 1032-33). Plaintiff reported that the pain medications he got at the hospital made him sleepy, but he was able to take a shower while using a stool, and he could walk a block with his cane. (Tr. at 1029-31, 1042). He was able to make a meal in the microwave, put some dishes in the dishwasher, and attend church once a week with his mother. (Tr. at 1035, 1037-38).

Plaintiff stated that he could lift 20 pounds, but it would hurt his hip. (Tr. at 1039). In reviewing Dr. Hershey's medical records of Plaintiff, the ALJ complained that the doctor had not "bothered to take any notes." (Tr. at 1045).

Plaintiff's wife, from whom he was separated, testified that she remained in contact with Plaintiff once or twice a week. (Tr. at 1047-48). She stated that she left Plaintiff in June 2006 because she could not deal with the stress of his condition and "the psychotic states that he would be in from the medication," which worsened the more he tried to find a job as he felt more stress. (Tr. at 1048-49). Plaintiff's wife noted that a sickle cell crisis he had in 2006 was precipitated by his attempt to work as a driver for a week. (Tr. at 1051). The ALJ inquired why Plaintiff could not work, and his wife testified that his pain medication made him too sleepy and sometimes his psychiatric medications caused him to be disoriented and he had gotten lost a couple of times. (Tr. at 1052-53). Plaintiff's wife also testified that Plaintiff had hallucinated spiders and mice that left him on the floor in a fetal position. (Tr. at 1054-55).

A vocational expert testified that Plaintiff could do light or sedentary unskilled work, such as a nut and bolt assembler or a bakery worker. (Tr. at 1057). The ALJ held the record open for an additional 30 days to get Plaintiff's complete medical records. (Tr. at 1060).

C.  **ALJ's Findings**

In August 2008, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since the date of filing his application and had the severe impairments of sickle cell anemia, major depressive disorder, and hip arthrosis, which had more than a minimal effect on his ability to work. (Tr. at 18, 24). However, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or exceeded one of those listed in 20 C.F.R.

6

Part 404, Subpart P, Appendix 1. (Tr. at 18). The ALJ noted that Plaintiff was mildly restricted in his daily living activities, but could bathe himself and do household chores and had moderate difficulties with social functioning although he attended church with his mother. (Tr. at 19). Plaintiff also had moderate difficulties with concentration, persistence, or pace, but had no episodes of deterioration. (Tr. at 19). Because Plaintiff's impairment did not result in sufficient marked limitations or repeated episodes of decompensation, the ALJ found that he did not have a sufficiently severe mental impairment to warrant an award of SSI. The ALJ determined that the medical evidence did not support Dr. Hershey's finding that Plaintiff's GAF score was 40 because that level of functioning was extreme and not consistent with his treatment notes, as such a score would mean that Plaintiff was impaired in reality testing or communication or had a major impairment in several areas, such as work, family relations, judgment, thinking, or mood. (Tr. at 20). The ALJ found that this conflicted with the ABC treatment notes of February 2006, which reported that Plaintiff's medications were effective and he was not feeling pain from the sickle cell disease, was trying to find a part-time job, and was not drowsy from his medications, although he did report hearing voices. (Tr. at 21). The ALJ further determined that Dr. Hershey's treatment notes generally indicated that Plaintiff was doing better, which was contrary to Dr. Hershey's mental health assessment giving a GAF of 40, and that the records from July 2007 through March 2008 showed that Plaintiff was essentially normal although he was anxious and depressed some of the time. (Tr. at 21).

The ALJ also considered Plaintiff's sickle cell disease, determining that Plaintiff's complaints of pain were not entirely credible because he had not had a sickle cell crisis since November 2005, and that the medical records did not support Plaintiff's testimony at the hearing

7

that he had been hospitalized three times during 2007 and once during 2008 for sickle cell crises, all of which the ALJ concluded detracted from his credibility because he was exaggerating. (Tr. at 20, 22). Although Plaintiff complained of left hip pain in December 2007, the ALJ stated that it must have improved because the medical record evidence was that in February 2008, Plaintiff stated that he had only been experiencing left hip pain for two days. (Tr. at 20). The ALJ further noted that Plaintiff himself testified at his hearing that he might be able to work if he could sit and stand at will. (Tr. at 21). Thus, the ALJ concluded that Plaintiff's pain was not disabling because it was not constant and wholly unresponsive to therapeutic treatment, which had been essentially routine and conservative in nature, insofar as he had only been in the hospital for one day in November 2005 for sickle cell crisis and otherwise just took prescription medication. (Tr. at 22).

The ALJ also discounted Plaintiff's wife's testimony, stating that her testimony that Plaintiff's medications made him drowsy and disoriented was not supported by the medical evidence which indicated that Plaintiff had not complained of such side effects to his treating physician since July 2007. (Tr. at 22). The ALJ further disbelieved Plaintiff's wife's testimony that Plaintiff got agitated and aggressive and had hallucinations, because those symptoms were not consistent with Plaintiff's treatment notes. (Tr. at 22).

The ALJ concluded that Plaintiff retained the residual functional capacity to perform light, unskilled work involved (1) lifting and carrying 20 pounds occasionally and 10 pounds frequently, (2) occasionally climbing ramps and stairs, balancing, stooping, and crawling, but not using ladders or scaffolds, (3) no use of foot pedals, (4) a sit/stand option, and (5) only incidental interaction with the public and coworkers. (Tr. at 19-20, 23).

D.      **Administrative Appeal Proceedings**

On appeal in June 2009, Plaintiff submitted post-hearing medical records from ABC, which reflected the following: In June 2008, Plaintiff reported that he had a new job. (Tr. at 926, 934, 957-58). Nevertheless, in September 2008, Plaintiff again stated that he was feeling depressed, and in October and November 2008, he was irritable and labile and twice reported hallucinations. (Tr. at 951, 953, 955).

Plaintiff also submitted additional medical records documenting his struggle with sickle cell disease. These records indicated that in reference to his December 2007 episode of severe hip pain, he was told to go to the emergency room for an evaluation. (Tr. 945, 947). Two months later, Plaintiff again went to the hospital for severe hip pain and was given prescription pain medication. (Tr. 922-25). In July and August 2009, Plaintiff was in the hospital for two and four days, respectively, due to sickle cell crisis, and he was prescribed pain medication, including morphine. (Tr. at 965, 980-81, 983, 985). Plaintiff's appeal was rejected. (Tr. at 3-5).

## II. ANALYSIS

A.      **Legal Standards**

   1.   **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d

558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or no contrary medical findings. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The relevant law and regulations governing the determination of disability under the SSI program are identical to those governing the determination of eligibility under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985). Thus, the Court may rely on decisions in both areas, without distinction, in reviewing an ALJ's decision. *Id. passim.*

### 2. Disability Determination

The definition of disability under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of

>     the regulations will be considered disabled without consideration of
>     vocational factors.
>
> 4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.
>
> 5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b-(f)). Under the first four steps of the analysis, the burden of proof lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

### B. <u>Issues for Review</u>

Plaintiff identifies the following issues for review: (1) Whether the ALJ improperly rejected the treating opinion of Dr. Hershey; (2) Whether the ALJ's failure to re-contact Dr. Hershey for further medical information is reversible error; and (3) Whether the ALJ's credibility findings are supported by substantial evidence. These issues will be discussed below.

**1. Whether the ALJ improperly rejected the treating opinion of Dr. Hershey**

Plaintiff argues that the ALJ did not give sufficient weight to Dr. Hershey's opinion insofar as she discounted his diagnosis and GAF score. (Doc. 14 at 14). Moreover, he claims that the ALJ did not apply the six-factor test of 42 U.S.C. § 404.1527(d) and remand is required on this basis. (*Id.* at 13-15).

Defendant responds that the ALJ did not completely reject Dr. Hershey's opinion, but only rejected the opinion he provided in June 2007 as to Plaintiff's work abilities because his opinion was inconsistent with Plaintiff's treatment notes. (Doc. 15 at 5-6). Defendant points to examples in Dr. Hershey's notes where Plaintiff reported doing relatively well in February, May, and August 2006, and contends that from July 2007 to March 2008, his mental status was normal although he was occasionally anxious or depressed. (*Id.* at 6-7). Moreover, Defendant notes that in June 2008, Plaintiff reported having a new job, which indicates that he is able to do some work. (*Id.* at 6-7). Finally, Plaintiff never reported any side effects from his medicine or required any psychiatric hospitalization. (*Id.* at 7). With regard to the statutory six-factor test, Defendant contends that the ALJ was not required to perform the test because she only rejected Dr. Hershey's opinion as to Plaintiff's disability, which is within the ALJ's purview. (*Id.* at 7-9).

Plaintiff replies that the six-factor test applies because the ALJ rejected Dr. Hershey's medical opinion as to Plaintiff's GAF score, not his legal opinion as to whether Plaintiff was disabled. (Doc. 18 at 2-3). Moreover, the ALJ improperly "played doctor" by rejecting Dr. Hershey's GAF score despite the fact that Dr. Hershey consistently concluded that Plaintiff's GAF was 40 and there was no contradictory medical opinion as to the score. (*Id.* at 3-4). Plaintiff also argues that the ALJ erroneously rejected Dr. Hershey's opinion about Plaintiff's

12

functional limitations without explanation and provided no medical opinion to support her conclusion that Plaintiff could work. (*Id.* at 4-5).

"[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). Every medical opinion is evaluated regardless of its source but the Commissioner generally gives greater weight to opinions from a treating physician. 20 C.F.R. § 416.927(d). In fact, when "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.*

If the evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Newton*, 209 F.3d at 455. A treating physician's opinion also may be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 455-56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id*. at 453 (emphasis in original). Those criteria include: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and

13

(6) the specialization of the treating physician. *Id.* at 455; *see also* 20 C.F.R. § 416.927(d)(2) (governing SSI). When an ALJ fails to consider all evidence from a treating source and fails to present good cause for rejecting it, the matter should be remanded for further consideration. *Newton*, 209 F.3d at 457.

A GAF of 40 means that a person has either "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Diagnostic and Statistical Manual of Mental Disorders IV-TR* at 32 (4th ed.). In this case, there was no contradicting medical evidence as to Plaintiff's score of 40, and the ALJ did not apply the six-step analysis in *Newton* when rejecting Dr. Hershey's score. *Newton*, 209 F.3d at 453. Thus, this case should be remanded for further proceedings. *Id.* at 457. On remand, the ALJ also should consider whether Dr. Hershey was in the best position to assess Plaintiff's psychiatric state as he treated Plaintiff on a regular basis, and he repeatedly found Plaintiff's GAF score to be 40. 20 C.F.R. § 416.927(d); *compare* Tr. at 372-75 (containing Dr. Hershey's findings that Plaintiff had extreme difficulty in maintaining concentration, remembering work procedures, and completing a normal workday, Plaintiff exhibited loss of interest in almost all activities, suffered sleep disturbance, and had marked difficulties in social functioning), with *Diagnostic and Statistical Manual of Mental Disorders IV-TR* at 32 (4th ed.) (noting that a GAF of 40 means that a person has major impairment in several areas, such as work, judgment, thinking, or mood).

### 2. Whether the ALJ's failure to re-contact Dr. Hershey for further medical information is reversible error

Alternatively, Plaintiff argues that the ALJ had a duty to fully develop the record and should have re-contacted Dr. Hershey because the medical record was insufficient in relation to Plaintiff's mental condition, and the ALJ had doubts about his records as evidenced by the fact that she said he had not taken sufficient notes. (Doc. 14 at 15-16). Plaintiff points out that he was a patient at ABC since 2003, so Dr. Hershey easily could have responded to any requests about his medical condition and, further, there is a reasonable probability that a more developed record would have affected the ALJ's ruling because the ALJ simply determined that Dr. Hershey's notes did not support his GAF finding. (*Id.* at 16-17).

Defendant responds that the ALJ satisfied her duty to fully develop the record, which contains hundreds of pages of treatment records from ABC. (Doc. 15 at 9-10).

In reply, Plaintiff argues that the ALJ should have sought a more detailed report from Dr. Hershey because she stated on the record that there were gaps or deficiencies in his notes, and Dr. Hershey could have dispelled any doubts the ALJ had. (Doc. 18 at 5-9). Plaintiff also contends for the first time that the medical evidence he submitted post-hearing was "critical," but the ALJ failed to obtain it before rendering her decision, and the Commissioner's refusal to remand the case in light of the new evidence was unjustified. (*Id.* at 8).

In *Newton*, 209 F.3d at 458, the Court of Appeals for the Fifth Circuit held that it is the ALJ's duty to seek additional information from a treating physician *sua sponte* if there are gaps in the record that further information could eliminate. Reversal is appropriate only if Plaintiff can show that additional evidence would have been produced if the ALJ had fully developed the

record, and the additional evidence could have led to a different decision. *Newton*, 209 F.3d at 458. In this case, the ALJ did suggest that there were gaps in the record caused by what she deemed to be insufficient note-taking on Dr. Hershey's part. Nevertheless, Plaintiff has not specified what additional evidence Dr. Hershey would have provided if the ALJ had sought additional information from him and how that evidence would have led to a different decision. *Id.*

### 3. Whether the ALJ's credibility findings are supported by substantial evidence

Plaintiff maintains that the ALJ's credibility finding as to Plaintiff's testimony was conclusory, and that she did not state how much weight she gave to the testimony. (Doc. 14 at 18-19). Further, Plaintiff contends, the ALJ's ultimate finding is not supported because the discrepancies she notes as to the frequency of his sickle cell crisis and the severity of his hip pain were belied by the 2009 medical records submitted to the Appeals Council. (*Id.* at 19). Finally, Plaintiff contends that the ALJ erroneously found incredible the testimony of his wife, even though her statement that Plaintiff's medication made him sleepy also is noted in Dr. Hershey's 2007 mental impairment questionnaire. (*Id.* at 20).

In response, Defendant argues that the ALJ was entitled to find Plaintiff's subjective complaints of disabling pain not credible based on his contradictory testimony that he could read, write, groom himself, prepare simple meals, attend church, and lift 20 pounds and stated that he worked during the relevant time frame at various part-time jobs. (Doc. 15 at 11). Further, Plaintiff testified that he might be able to work at a job that had a sit/stand option, and the ALJ accounted for Plaintiff's medical problems in finding that he could do light work with some

16

limitations. (*Id.* at 12). Defendant also points out that the ALJ correctly ruled that Plaintiff's testimony that he was hospitalized "all the time" for sickle cell crisis was an exaggeration because he never was hospitalized for sickle cell crisis during the relevant time frame. (*Id.* at 12-13). As for the post-hearing medical records that Plaintiff submitted, Defendant contends that Plaintiff's statement that his August 2009 hospitalization was precipitated by his doing strenuous yard work is contradictory to his testimony that he suffered from disabling pain and could not sit without bracing himself with one arm. (*Id.* at 13). Finally, Defendant maintains that the ALJ correctly found Plaintiff's wife's testimony to not be credible because Plaintiff never reported medication side effects to his doctors. (*Id.* at 13-14).

In reply, Plaintiff urges that the ALJ should have held the record open for a longer period of time to allow him to supplement the record with additional medical records rather than finding that Plaintiff's testimony about being recently hospitalized for sickle cell crisis was not supported by the record, when she was aware that he had been hospitalized before the hearing. (Doc. 18 at 10). Further, he states that the Commissioner should have remanded the case at the Appeals Council level when the new evidence which contradicted the ALJ's findings was submitted. (*Id.* at 15).

Additionally, Plaintiff contends that Defendant improperly uses against him his attempts to work at various part-time jobs, since Plaintiff cannot perform sustained work activity in an ordinary work setting on a regular basis, as evidenced by his having to leave several jobs due to poor performance. (*Id.* at 11-13). Next, Plaintiff argues that the ALJ never considered whether he could meet the listing governing sickle cell anemia and further did not consider that his pain crises have resulted in extended hospitalizations and use of opioid medications. (*Id.* at 13-14).

17

Finally, Plaintiff argues that the ALJ wrongly rejected Plaintiff's wife's testimony because she did not live with him even though she testified that she maintained close contact with him after their separation. (*Id.* at 14-15).

"It is within the ALJ's discretion to determine the disabling nature of a claimant's pain, and the ALJ's determination is entitled to considerable deference." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001). "The determination whether a claimant is able to work despite some pain is within the province of the administrative agency and should be upheld if supported by substantial evidence." *Id*. Moreover, pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment" to be disabling. *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994). Subjective complaints of pain must be corroborated by objective medical evidence. *Chambliss*, 269 F.3d at 522. In the Fifth Circuit, an ALJ must articulate the reasons for rejecting a claimant's subjective testimony about pain only where the medical evidence clearly favors the claimant. *Falco*, 27 F.3d at 163. Residual functional capacity is an assessment of an individual's ability to perform sustained work-related physical activities in a work setting for eight hours a day, five days a week, or the equivalent work schedule. *See* Social Security Ruling 96-8p.

The ALJ's findings as to Plaintiff's credibility are not supported by substantial evidence. The ALJ discounted Plaintiff's subjective complaints of pain, claiming that Plaintiff testified at his hearing that he might be able to work if he could sit and stand at will. This is a misrepresentation, however, because the ALJ herself pointed out that Plaintiff had to brace himself with one arm while he was sitting so that he did not place pressure on his hip. The ALJ also determined that Plaintiff's complaints of pain were not entirely credible because he had not had sickle cell crisis since November 2005, but this is belied by the ALJ's acknowledgment at

18

the hearing that Plaintiff was hospitalized for sickle cell disease in February 2008. Further, the ALJ incorrectly stated in making her adverse credibility finding that Plaintiff exaggerated at the hearing by saying that he had been hospitalized three times during 2007 and once during 2008 for sickle cell crises, but Plaintiff never testified to that. Further, the ALJ's conclusion that Plaintiff's pain was not disabling because he just took prescription medication is meritless. Courts have recognized that sickle cell disease can cause chronic, severe, and acute pain. *See Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006) (noting type of pain); *Ross v. Apfel*, 218 F.3d 844, 847 (8th Cir. 2000) (same); *Higgins v. Apfel*, 136 F. Supp. 2d 971, 980 (E.D. Mo. 2001) (noting that there is no evidence that more drastic methods of treating sickle cell pain were more effective than taking prescription pain medication). Finally, the court should reject Defendants' attempts to undercut the disability claim simply due to Plaintiff's efforts to perform part-time work because his ability to do such work on an occasional, part-time basis, does not mean that he can work full time. *See* Social Security Ruling 96-8p.

It is questionable whether the ALJ also erred in discounting Plaintiff's wife's testimony that Plaintiff's medications made him drowsy and disoriented on the basis that Plaintiff had not complained of such side effects to his treating physician since July 2007. (Tr. at 22). Plaintiff complained of the side effects to his doctor on at least that one occasion, and Defendant points to no requirement that he complain repeatedly. Nevertheless, the ALJ's decision to find incredible Plaintiff's wife's testimony otherwise was supported by substantial evidence because while Plaintiff's wife testified that Plaintiff had severe hallucinations, such is not documented in the medical record during the relevant timeframe. Further, Plaintiff's 2009 medical records which he submitted to the Appeals Council are not relevant to the pain issue because the Appeals Council

19

only could consider additional medical evidence if it related to the period on or before the date of the ALJ's decision, which was August 2008. 20 C.F.R. § 416.1470(b).

### III. CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court **REVERSE and REMAND** for further proceedings.

**SIGNED** this 27th day of August, 2010.

**RENÉE HARRIS TOLIVER**
**UNITED STATES MAGISTRATE JUDGE**

### INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE